UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ISAAC MILLER, | Case No. 1:12-cv-00137 LJO SAB |
| Plaintiff, | ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| v. | |
| STEVEN JOHN SCHMITZ, et al., | (Doc. 52) |
| Defendants. | |

Pending before the Court is Defendants Steven John Schmitz ("Officer Schmitz") and the City of Hanford's ("the City's") (collectively "Defendants") motion for summary judgment. Plaintiff Isaac Miller ("Plaintiff") has opposed the motion, and Defendants have filed a reply. Having considered the parties' submissions, and for the reasons discussed below, the Court DENIES Defendants' motion for summary judgment.

I.   BACKGROUND

   A.   Factual Background

This case involves an allegedly unlawful arrest for assault.

   1.   The Night of the Alleged Assault

In the evening of February 17, 2010, Officer Schmitz was called to Adventist Medical Center – Hanford, where he spoke with Ronald Silva ("Mr. Silva"). Mr. Silva was being treated at the hospital

1

for a laceration above his eye and for injuries to his right hand.  Mr. Silva claimed that two unknown males attacked him outside of Applebee's, but insisted that he did not want to file a police report.  Mr. Silva appeared to have been drinking; he smelled fairly strongly of alcohol from a distance of three feet, his speech was slightly slurred, and his eyes were slightly bloodshot.

### 2. The Investigation

On February 19, 2010, Mr. Silva presented to the Hanford Police Department and spoke with Officer Arturo Alvarez ("Officer Alvarez") regarding the February 17, 2010 incident.  Mr. Silva told Officer Alvarez that he knew who his two attackers were: "Jacob Miller," who lived near Highway 41 and Elgin Avenue, and Jacob Miller's cousin.  Officer Alvarez recorded this information, took photos of Mr. Silva's wounds, and created a supplemental report based on his interview with Mr. Silva.  The report was forwarded to Officer Schmitz.

On February 22, 2010, David Dodd, Mr. Silva's nephew, called Officer Schmitz and told him that Mr. Silva knew the people who were involved in the assault.  Officer Schmitz, in turn, called Mr. Silva.  Mr. Silva confirmed that he knew at least one of the men who attacked him and explained that he did not identify the man earlier because he was afraid of retaliation.

On February 23, 2010, Officer Schmitz met with Mr. Silva, and Mr. Silva recalled the assault as follows.  On the night of the attack, he, Jacob Miller, and a "Ron" from Riverdale were told to leave Chili's because they were arguing.[1]  Once in the parking lot, Jacob Miller said that his dad, who "still is a crazy mother fucker," was going to beat Mr. Silva up.  Mr. Silva tried to defuse the situation by attempting to shake Jacob Miller's hand, but before he knew it, he was knocked-out from behind.  By the time Mr. Silva regained consciousness less than a minute later, Jacob Miller and Ron were already walking away from the scene.

After Mr. Silva described his assailants by race, weight, and height, Officer Schmitz presented Mr. Silva a "six-pack" photo line-up. Officer Schmitz said, "I'm going to show you one photo lineup that I have.  It was the only name that I could find in regard to the names you gave me yesterday, when

---

[1] This is in contrast to Mr. Silva's earlier statement to Officer Schmitz, in which Mr. Silva said he was outside Applebee's.  Still, it should be noted that Chili's and Applebee's are both located in the same shopping mall where Mr. Silva claimed he had been.

2

we talked on the phone." Then, with little hesitation, Mr. Silva identified Plaintiff as "the Miller kid" who was involved in the assault.

On or around March 3, 2010, Officer Schmitz spoke with the manager at Chili's and obtained the names of a bartender and a waitress who had worked at Chili's on the night of February 17, 2010. Officer Schmitz attempted to contact these employees, but he has no recollection of actually speaking to either of them. Nevertheless, there is evidence that Officer Schmitz may have spoken with Michael Signorile ("Mr. Signorile"), a bartender/server at Chili's.

Mr. Signorile testified in his deposition that a few days after the February 17, 2010 incident, a male police officer from the Hanford Police Department called him seeking information regarding the alleged assault. The conversation was not long. Mr. Signorile told the officer that he had been in the back of the restaurant and therefore did not personally see most of the events surrounding the incident. However, Mr. Signorile indicated that he had heard from his co-workers who were working with him that night that while they might have seen Mr. Silva and two other men "exchange some words," they did not see any physical altercation. Based on this information, Mr. Signorile told the officer that he did not believe anything had happened.

On March 4, 2010, Officer Schmitz prepared a police report and requested that it be forwarded to the Kings County District Attorney's Office. In Officer Schmitz's opinion there was probable cause to arrest and charge Plaintiff for assault under California Penal Code section 245(a)(1). Absent from Officer Schmitz's report was any mention of a conversation with Mr. Signorile.

### 3.     The Arrest and Prosecution

Deputy District Attorney Adam Nelson ("D.A. Nelson") reviewed Officer Schmitz's report and approved the filing of criminal charges against Plaintiff. D.A. Nelson did not request any further investigation or additional information from Officer Schmitz, and Plaintiff was arrested pursuant to a warrant on February 6, 2011.

On June 8, 2011, a preliminary hearing was held. Deputy District Attorney Michael Casaus ("D.A. Casaus") prosecuted the case, and Officer Schmitz testified. In his testimony, Officer Schmitz asserted, among other things, that after interviewing Mr. Silva on February 23, 2010 he went to Chili's and obtained the names of a bartender and a waitress who had worked the night of the alleged assault.

1  Officer Schmitz indicated, however, that he never actually spoke with either of them.  Officer Schmitz
2  also indicated that while he had recorded the two names in his investigation notes, the notes had been
3  destroyed, as he typically discards all his notes when he switches to a new notebook.  Notably, Officer
4  Schmitz made no mention of any conversation with Mr. Signorile.  Based on the evidence presented,
5  the court concluded that there was probable cause supporting Plaintiff's arrest for assault pursuant to
6  section 245(a)(1).

7  On or around January 23, 2012, on the eve of Plaintiff's trial, Deputy District Attorney Sarah
8  Hacker ("D.A. Hacker") listened to audio recorded witness statements that were provided to her and
9  decided not to prosecute Plaintiff.  Although D.A. Hacker had previously reviewed Officer Schmitz's
10 report and believed then that there was sufficient evidence to prosecute Plaintiff, D.A. Hacker found
11 that the independent witness statements differed from Mr. Silva's version of the events.  D.A. Hacker
12 therefore dismissed Plaintiff's charges on January 23, 2012.

13 **B.     Procedural History**

14 Plaintiff filed a complaint and initiated this action on January 29, 2012.  The complaint asserts
15 claims for (1) false arrest and malicious prosecution against Officer Schmitz pursuant to 42 U.S.C. §
16 1983; (2) expungement of Plaintiff's arrest record by the City pursuant to 28 U.S.C. § 2201; and (3)
17 malicious prosecution against Mr. Silva under California state law.  In terms of relief, Plaintiff seeks
18 damages and declaratory relief.

19 Plaintiff's claims have since narrowed.  In its order on Defendants' motion to dismiss, filed on
20 May 8, 2012, the Court construed Plaintiff's claims for false arrest and malicious prosecution against
21 Officer Schmitz as a single claim for malicious prosecution.  In addition, on April 15, 2013, Plaintiff
22 and Mr. Silva reached a settlement agreement.  Thus, as the case now stands, only two claims remain
23 for adjudication: (1) malicious prosecution against Officer Schmitz; and (2) expungement of Plaintiff's
24 arrest record by the City.

25 On June 4, 2013, Defendants filed the now pending motion for summary judgment.  Plaintiff
26 filed an opposition to the motion on July 10, 2013, and Defendants filed a reply on July 17, 2013.  The
27 Court deemed this matter to be suitable for decision without oral argument and took the matter under
28 submission pursuant to Local Rule 230(g).

4

## II. LEGAL STANDARD

Summary judgment is appropriate when the pleadings, disclosure materials, discovery, and any affidavits provided establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that may affect the outcome of the case under the applicable law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable trier of fact could return a verdict in favor of the nonmoving party." Id.

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). The exact nature of this responsibility, however, varies depending on whether the issue on which summary judgment is sought is one in which the movant or the nonmoving party carries the ultimate burden of proof. See Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007); Cecala v. Newman, 532 F. Supp. 2d 1118, 1132 (D. Ariz. 2007). If the movant will have the burden of proof at trial, it must demonstrate, with affirmative evidence, that "no reasonable trier of fact could find other than for the moving party." Soremekun, 509 F.3d at 984. In contrast, if the nonmoving party will have the burden of proof at trial, "the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." Id. (citing Celotex, 477 U.S. at 323).

If the movant satisfies its initial burden, the nonmoving party must go beyond the allegations in its pleadings to "show a genuine issue of material fact by presenting *affirmative evidence* from which a jury could find in [its] favor." FTC v. Stefanchik, 559 F.3d 924, 929 (9th Cir. 2009) (emphasis in the original). "[B]ald assertions or a mere scintilla of evidence" will not suffice in this respect. Id. at 929. See also Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.") (citation omitted). "Where the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine

1 issue for trial.'" Matsushita, 475 U.S. at 587 (quoting First Nat'l Bank of Arizona v. Cities Serv. Co.,
2 391 U.S. 253, 289 (1968)).

3 In resolving a summary judgment motion, "the court does not make credibility determinations
4 or weigh conflicting evidence." Soremekun, 509 F.3d at 984. That remains the province of the jury or
5 fact finder. See Anderson, 477 U.S. at 255. Instead, "[t]he evidence of the [nonmoving party] is to be
6 believed, and all justifiable inferences are to be drawn in [its] favor." Id. Inferences, however, are not
7 drawn out of the air; the nonmoving party must produce a factual predicate from which the inference
8 may reasonably be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D.
9 Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

10 **III. DISCUSSION**
11 **A. Malicious Prosecution**

12 To establish a claim for malicious prosecution under § 1983, a plaintiff must (a) satisfy all the
13 elements of a claim for malicious prosecution under state law; and (b) show that the prosecution was
14 conducted with the intent of depriving the plaintiff a constitutional right. See Usher v. Los Angeles,
15 828 F.2d 556, 561-62 (9th Cir. 1987). In California, the elements of malicious prosecution are (1) the
16 initiation and termination of a criminal prosecution in the plaintiff's favor; (2) the absence of probable
17 cause; and (3) malice. See Siebel v. Mittlesteadt, 41 Cal. 4th 735, 740 (2007); Silas v. Arden, 213 Cal.
18 App. 4th 75, 89 (Ct. App. 2012).

19 **1. Probable Cause**

20 "Probable cause to arrest exists when officers have knowledge or reasonably trustworthy
21 information sufficient to lead a person of reasonable caution to believe that an offense has been or is
22 being committed by the person being arrested." United States v. Lopez, 482 F.3d 1067, 1072 (9th Cir.
23 2007) (citation omitted). Probable cause is an objective standard that takes into account the totality of
24 the circumstances known to the officers at the time of the arrest. John v. City of El Monte, 515 F.3d
25 936, 940 (9th Cir. 2008). Although conclusive evidence of guilt is not necessary to establish probable
26 cause, "[m]ere suspicion, common rumor, or even strong reason to suspect are not enough." Lopez,
27 482 F.3d at 1072 (quoting McKenzie v. Lamb, 738 F.2d 1005, 1008 (9th Cir. 1984)). There must be a
28 "fair probability" that the person being arrested has committed an offense. Beier v. City of Lewiston,

354 F.3d 1058, 1065 (9th Cir. 2004).

Defendants contend that probable cause existed to arrest Plaintiff for violating California Penal Code section 245(a)(1), which makes it an offense for a person to commit an assault using any means of force likely to produce great bodily injury. As support for their position, Defendants rely heavily on Mr. Silva's statements on February 23, 2010. Defendants maintain that on February 23, 2010, Mr. Silva provided Officer Schmitz a detailed account of the assault and affirmatively identified Plaintiff in a photo line-up as an assailant.

Defendants' reliance on Mr. Silva's statements to establish probable cause to arrest Plaintiff is problematic. "[O]fficers may obviously rely on statements made by the victims of a crime to identify potential suspects. But such information does not, on its own, support a finding of probable cause *if the information is not reasonably trustworthy or reliable*." Stoot v. City of Everett, 582 F.3d 910, 919 (9th Cir. 2009) (emphasis added).[2] Here, there is evidence suggesting that Mr. Silva's statements were not sufficiently trustworthy or reliable.

First, there is evidence that Mr. Silva had been drinking on the night of the alleged assault. As Officer Schmitz interviewed Mr. Silva at the hospital, Officer Schmitz observed that Mr. Silva smelled fairly strongly of alcohol from a distance of three feet, his eyes were slightly bloodshot, and his speech was slightly slurred. While, as Defendants correctly point out, this does not necessarily mean that Mr. Silva was intoxicated to the point where his memory was totally compromised, it does suggest that Mr. Silva drank a not insignificant amount of alcohol – most likely more than the "one beer" that Mr. Silva claimed to have drank – and that Mr. Silva might not have had the best recollection as to the events of the night in question.

Second, there were some inconsistencies in Mr. Silva's recollection of the alleged assault. On the night of the alleged assault, Mr. Silva indicated to Officer Schmitz that he was attacked outside of

---

[2] The Ninth Circuit's decision in Peng v. Hu, 335 F.3d 970 (9th Cir. 2003), which Defendants cite to and rely on in their brief, provides no differently. In Peng, the Ninth Circuit held that "the presence of a factual dispute regarding a victim's complaint at the scene of an alleged [crime] does not defeat probable cause if: 1) the victim's statements are sufficiently definite to establish that a crime has been committed; *and* 2) the victim's complaint is corroborated by either the surrounding circumstances or other witnesses." Id. at 979 (emphasis added). Thus, as applied in this case, Mr. Silva's statements to Officer Schmitz establishes probable cause if (1) Mr. Silva's statements were sufficiently detailed; *and* (2) the statements were sufficiently corroborated (i.e., were reasonably trustworthy and reliable).

1 Applebee's. Yet the next time Mr. Silva met with Officer Schmitz, he claimed that the attack occurred
2 in the parking lot of Chili's. Mr. Silva also claimed that he knew one of his assailants, identifying him
3 specifically as either "Jacob" or "Jason" Miller. But Mr. Silva identified Plaintiff (Isaac Jared Miller)
4 in the photo line-up. Finally, Mr. Silva claimed that he had been knocked unconscious from behind by
5 one of his assailants. Yet, while Officer Schmitz observed that Mr. Silva had suffered injuries, there is
6 no indication that Mr. Silva ever displayed any signs of head injury.

7 This alone might not be enough to undermine the reliability of Mr. Silva's statements. There is
8 another piece of evidence: Mr. Signorile's conversation with Officer Schmitz.

9 Defendants insist that Officer Schmitz never spoke with Mr. Signorile. However, there is
10 circumstantial evidence in the record showing that Officer Schmitz did. Mr. Signorile testified in his
11 deposition that a few days after the alleged assault he spoke with a male police officer from the
12 Hanford Police Department. Moreover, the record appears to show that the only two officers involved
13 in investigating Mr. Silva's assault were Officer Schmitz and Officer Alvarez. Yet, Officer Alvarez's
14 involvement was strictly limited to taking Mr. Silva's statement on February 19, 2010, while Officer
15 Schmitz acted as the lead investigator.

16 Also in dispute is what, specifically, Mr. Signorile told Officer Schmitz. Defendants stress that
17 even assuming Mr. Signorile did speak with Officer Schmitz, the only thing that Mr. Signorile told the
18 officer was that he did not personally see any physical altercation take place (or much of anything else
19 for that matter) because he was in the back of the restaurant. But Mr. Signorile's deposition testimony
20 suggests that his conversation with Officer Schmitz went further. Mr. Signorile testified that on the
21 night of the alleged assault, Jenna, a co-worker who was outside at the time of the alleged assault, told
22 him that she did not see any physical altercation:

23     Q.     Okay. So you are leaving [work] and you see Jenna outside?
24     A.     Uh-huh.
25     Q.     And you strike up a conversation with her about this incident?
26     A.     I just asked her if she [had] seen anything, and like I said, I just remember her
saying – and she didn't even know Isaac or anything, she just said, I remember
27             her saying: The two black guys [Plaintiff and his friend] were trying to rush to
their car and the white guy [Mr. Silva] was following them out [of the
28             restaurant] and he was trying to get them to fight. And she remembered hearing

8

        Isaac [Plaintiff] saying that he didn't want – they didn't want any problems, and they just went to the car and got in the car and took off.

* * *

Q.    Did she say that she saw any kind of physical altercation?

A.    No.

(Signorile Depo. at 71:15-72:3; 72:11-13.)  And while it is unclear what specifically was said, Mr. Signorile appears to have relayed this information to Officer Schmitz:

Q.    And what did you tell him [the police officer]?  What do you recall telling him?

A.    Pretty much what I told you.  That I guess there was some words exchanged at the bar.  I don't know, I wasn't there.  And then that Mr. Silva followed the individuals out to the car, and Isaac [Plaintiff] took off.  That was that.  It was a real quick conversation.  I mean, there was nothing to tell.  I didn't see anything.

* * *

Q.    Okay.  Because this, now I'm on paragraph 4, it's the last sentence, and you are referring to this officer from the Hanford Police Department that had phoned, you said, 'I told him there had been no fight between Miller and Silva.'

    Did you actually tell the officer that you – or that there was no fight between the two of them?

A.    Probably, yeah, because he asked me what was going on.

Q.    Okay.  But you didn't know one way or the other if there was a fight?

    [objection]

A.    I'm going to say I didn't know.  I heard a lot of things, and from Jenna, or from people or from Jenna that was outside, that she said there was no fight out there.  So I'm going off everything that I'm telling you is all stuff that I heard.

Q.    So would you have told the officer, then, that you did not eyewitness what occurred in the parking lot?

A.    Right.

Q.    But from what you have had learned from others, you did not believe that a fight had occurred?

A.    Correct.

    [objection]

Q.    Okay.  So, again, as you sit here now, based on your personal knowledge, you don't know one way or the other what actually occurred in the parking lot?

9

    A.    As far as me seeing with my own eyeballs, no.

    Q.    And when you spoke to the law enforcement officer, did you tell him about any people that might have actually seen what occurred in the parking lot?

    A.    Yeah. But I didn't give out no names, because it was like when Ivan had contacted me, I just don't give out people's information like that.

(Id. at 82:1-8; 131:24-133:12.)

Thus, when all the evidence is viewed in the light most favorable to Plaintiff, the record shows that Officer Schwarz knew that (1) Mr. Silva had been drinking a not insignificant amount of alcohol on the night of the alleged assault; (2) there were some inconsistencies in Mr. Silva's recollection of the alleged assault; and most importantly (3) although Mr. Signorile did not personally witness much, he believed that no physical altercation took place because he had heard from his co-workers who did see the incident that there was no fight.[3] A jury could conclude from this that Mr. Silva's statements were not sufficiently reliable; that the information within Officer Schmitz's knowledge thus fell shy of establishing with "fair probability" that Plaintiff assaulted Mr. Silva; and that at the very least Officer Schmitz should have investigated the matter further. See United States v. Ortiz-Hernandez, 427 F.3d 567, 574 (9th Cir. 2005) ("As a corollary . . . of the rule that the police may rely on the totality of facts available to them in establishing probable cause, *they also may not disregard facts tending to dissipate probable cause*.") (emphasis added and citation omitted). Accordingly, Defendants are not entitled to summary judgment on the grounds that there is no dispute of fact as to whether probable cause existed for Plaintiff's arrest.

### 2. Malice and Intent

Defendants argue that Plaintiff has no evidence that Officer Schmitz acted with malice or with an intent to deny Plaintiff of a constitutional right. "Malice" relates to the subjective intent or purpose

---

[3] To be clear, Defendants interpretation of Mr. Signorile's deposition testimony is certainly arguable (i.e., Mr. Signorile simply told Officer Schmitz that he did not believe a physical altercation took place but he did not personally witness anything). But so is Plaintiff's interpretation (i.e., Mr. Signorile told Officer Schmitz that while he did not personally see much, he did not believe any physical altercation took place because his co-workers who did witness the incident told him that there was no fight). On summary judgment, Plaintiff's interpretation prevails.

Also, the Court notes that Mr. Signorile's information could not be disregarded simply because it was essentially hearsay. "Police may rely on hearsay and other evidence that would not be admissible in a court to determine probable cause[.]" Hart v. Parks, 450 F.3d 1059, 1066 (9th Cir. 2006).

of the defendant. Soukup v. Law Offices of Herbert Hafif, 39 Cal. 4th 260, 292 (2006). It requires a showing of improper purpose, one unrelated to bringing a perceived guilty person to justice. Downey Venture v. LMI Ins. Co., 66 Cal. App. 4th 478, 494 (Ct. App. 1998). Malice, however, need not rise to the level of ill will; it "may range anywhere from open hostility to indifference." Soukup, 39 Cal. 4th at 292. In a similar vein, intent to deny a person a constitutional right presupposes knowledge of or deliberate indifference to the constitutional rights allegedly at issue. Poppell v. City of San Diego, 149 F.3d 951, 962 (9th Cir. 1998).

Since parties rarely admit an improper motive, malice and wrongful intent are usually proven by circumstantial evidence and from inferences drawn from the evidence. See Silas, 213 Cal. App. 4th at 90. Here, there is circumstantial evidence from which a fact finder could arguably infer that Officer Schmitz was knowingly indifferent to Plaintiff's rights. Specifically, at Plaintiff's preliminary hearing Officer Schmitz testified that he was unable to speak with any Chili's employees regarding the alleged assault:

> Q. All right, did you make any attempt to determine whether anyone at Chili's was aware of the incident that occurred on the 17th?
>
> A. Yes.
>
> Q. Who did you speak to?
>
> A. I actually went to the restaurant and checked for the bartender and I believed the waitress that might have been on duty that he referred to that night.
>
> Q. Did you speak to them?
>
> A. No.
>
> * * *
>
> Q. Did you talk to anyone else at Chili's as to whether they observed an incident that occurred on the 17th?
>
> A. No.

(Doc. 54-1 Ex. B, Prelim. Hr'g Tr., at 25:9-19; 26:17-20.) However, if in fact Mr. Signorile did speak with Officer Schmitz and made exculpatory statements, Officer Schmitz's testimony at the preliminary hearing would have been false and with obvious detriment to Plaintiff's criminal defense.

///

11

Moreover, an inference can arguably be drawn from the evidence that Officer Schmitz tried to conceal Mr. Signorile's identity. At Plaintiff's preliminary hearing, Officer Schmitz testified that his investigation notes had been destroyed:

> Q. What were the names of the bartender and waitress?
>
> A. I don't recall at this time.
>
> Q. Did you take any notes at this investigation?
>
> A. Yes, I did.
>
> Q. Did you memorialize those notes, did you write them down?
>
> A. Yes.
>
> Q. Do you still have those notes?
>
> A. No.
>
> Q. What did you do with those notes?
>
> A. Usually they are destroyed once I get a new notebook.

(Id. at 25:22-26:7.) However, Officer Schmitz's investigation notes were produced during discovery in this case *and*, curiously, on one page of Officer Schmitz's notes there is a notation that includes the phone number to Chili's along with two names: "Audry" and "Mike." (Doc. 54-1 Ex. E, Defs.' Resp. to Pl.'s Req. for Produc. Of Docs. Set Two, at HPD/Schmitz 0959.) A fact finder could conclude that "Mike" refers to Michael Signorile.

The Court, therefore, cannot say that the record is devoid of evidence from which an inference could be drawn that Officer Schmitz acted maliciously and with the purpose of depriving Plaintiff of his rights. Accordingly, Defendants are not entitled to summary judgment on this basis. See Estate of Tucker v. Interscope Records, Inc., 515 F.3d 1019, 1030 (9th Cir. 2008) ("Malice is usually a question of fact for the jury to determine.") (citation omitted).

### 3. Causation

Defendants argue that Plaintiff cannot overcome the presumption of independent prosecutorial judgment and the causation issue it presents. The presumption of independent prosecutorial judgment describes the assumption under the law that a prosecutor exercises independent judgment in deciding whether probable cause to arrest exists. See Smiddy v. Varney, 665 F.2d 261, 266-67 (9th Cir. 1981).

1  Because of this presumption, investigating officers generally may not be held liable for damages for an
2  unlawful arrest when a prosecutor elects to file criminal charges against a suspect.  See id. at 267.  The
3  causal link between the actions of the investigating officers and any unlawful arrest and prosecution is
4  presumed to have been broken by the prosecutor's own actions.  See id.
5        Nevertheless, a plaintiff may rebut the presumption of independent prosecutorial judgment by
6  offering evidence demonstrating that the prosecutor's judgment was somehow compromised, such as
7  when an investigating officer pressures the prosecutor to file charges or when an investigating officer
8  omits relevant and material information from his report.  See Harper v. City of Los Angeles, 533 F.3d
9  1010, 1028 (9th Cir. 2008); Smiddy, 665 F.2d at 267.  For example, in Barlow v. Ground, 943 F.2d
10 1132 (9th Cir. 1991), the Ninth Circuit concluded that there was sufficient evidence in the record to
11 rebut the presumption of independent prosecutorial judgment where (1) the prosecutor's only source
12 of information regarding the arrest was the arresting officers' police reports; and (2) the police reports
13 omitted crucial information, including the fact that an independent witness corroborated the plaintiff's
14 version of the events.  Id. at 1137.
15       The evidence in this case mirrors that which was presented in Barlow.  Here, there is evidence
16 that D.A. Nelson, D.A. Casaus, and D.A. Hacker relied entirely on Officer Schmitz's police report and
17 testimony and did not conduct any additional, independent investigation.  Officer Schmitz's report and
18 testimony, however, made no mention of Mr. Signorile, who, when the evidence is viewed in the light
19 most favorable to Plaintiff, provided exculpatory statements.  Thus, even if D.A. Nelson, D.A. Casaus,
20 and D.A. Hacker each concluded at different times that probable cause existed to arrest and prosecute
21 Plaintiff, their conclusions were all the product of (and therefore were similarly compromised by) their
22 reliance on Officer Schmitz's deficient report and testimony.  In this respect, Officer Schmitz's actions
23 can still be deemed to be the proximate cause of Plaintiff's arrest and prosecution, the presumption of
24 independent prosecutorial judgment notwithstanding.
25     **B.**    **Qualified Immunity**
26       Defendants assert that Officer Schmitz is entitled to qualified immunity.  Qualified immunity
27 shields government officials from liability for civil damages, "insofar as their conduct does not violate
28 clearly established statutory or constitutional rights of which a reasonable person would have known."

1 Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The underlying purpose of qualified immunity is to
2 balance the "need to hold public officials accountable when they exercise power irresponsibility and
3 the need to shield officials from harassment, distraction, and liability when they perform their duties
4 reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009).

5     Determining whether an official is entitled to qualified immunity requires a two-part analysis.
6 See Saucier v. Katz, 533 U.S. 194, 201 (2001). First, the court must decide whether the facts, taken in
7 the light most favorable to the plaintiff, show that the defendant's conduct violated a constitutional or
8 statutory right. Id. Second, the court must determine whether that right was "clearly established." Id.
9 A right is clearly established if "it would be clear to a reasonable officer that his conduct was unlawful
10 in the situation he confronted." Id. at 202. Although it is "often beneficial" for the court to proceed in
11 the sequence outlined above, it is within the court's discretion to decide "which of the two prongs of
12 the qualified immunity analysis should be addressed first." Pearson, 555 U.S. at 236. If at any point
13 the court concludes that one of the prongs is not met, the defendant is entitled to qualified immunity
14 and is immune from the suit for damages. See id.

15     Here, Defendants maintain that Officer Schmitz did not violate Plaintiff's clearly established
16 rights because, based on the information known to Officer Schmitz, "a reasonable officer *could* have
17 believed that probable cause existed to arrest [Plaintiff]." Franklin v. Fox, 312 F.3d 423, 437 (9th Cir.
18 2002) (emphasis added and citation omitted). See also Rosenbaum v. Washoe County, 663 F.3d 1071,
19 1076 (9th Cir. 2011) (in the context of an unlawful arrest, an officer is entitled to qualified immunity if
20 it is "reasonably arguable" that there was probable cause to arrest). Defendants reiterate that Officer
21 Schmitz based his decision to recommend Plaintiff's arrest on detailed statements by Mr. Silva, along
22 with Officer Schmitz's own observance of Mr. Silva's injuries. Defendants argue further that Officer
23 Schmitz drafted a complete and competent police report, with which none of the Deputy District
24 Attorneys involved in the case expressed any concern.

25     The same factual dispute that precludes summary judgment in favor of Officer Schmitz on the
26 issue of probable cause precludes qualified immunity. Once again, there is a critical factual dispute as
27 to whether Mr. Signorile spoke with Officer Schmitz and, if so, what specifically Mr. Signorile said to
28 Officer Schmitz. Resolution of this factual dispute is material to any determination regarding whether,

based on all the circumstances and information known to Officer Schmitz, "a reasonable officer could have believed that probable cause existed to arrest" Plaintiff. Franklin, 312 F.3d at 437. Accordingly, Officer Schmitz is not entitled to qualified immunity at this juncture. See Conner v. Heiman, 672 F.3d 1126, 1131 (9th Cir. 2012) (the issue of qualified immunity should be resolved by the court only when the material, historical facts are not genuinely in dispute); see also Act Up!/Portland v. Bagley, 988 F.2d 868, 873 (9th Cir. 1993) ("If a genuine issue of fact exists preventing a determination of qualified immunity at summary judgment, the case must proceed to trial. . . . [A] determination of . . . probable cause requires an inquiry as to the facts and circumstances within an officer's knowledge. These are matters of fact to be determined, where genuine disputes of a material nature exist, by the fact finder.") (internal citations omitted).

### C. Punitive Damages

Punitive damages are recoverable in an action under § 1983 where the defendant's conduct is "shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Smith v. Wade, 461 U.S. 30, 56 (1983). Defendants contend that Plaintiff cannot show that Officer Schmitz acted with indifference to Plaintiff's rights. However, as explained above in the context of malice and intent, there is a factual dispute as to whether Officer Schmitz knowingly testified falsely during Plaintiff's preliminary hearing, which, if true, would support a finding that Officer Schmitz acted recklessly or with callous indifference to Plaintiff's rights. Accordingly, Defendants are not entitled to summary judgment on this issue.

### D. Expungement of Arrest Records

Defendants maintain that Plaintiff's claim to expunge his arrest records fails because there was probable cause to arrest Plaintiff. However, as explained in detail above, there is a genuine dispute of fact on this issue. Accordingly, Defendants are not entitled to summary judgment on this claim.[4]

///

---

[4] It is unclear whether expungement can serve as a standalone claim or whether it is merely a remedy tethered to Plaintiff's claim for malicious prosecution. The parties should be prepared to discuss this issue in their joint pretrial statement and during the parties' pretrial conference, should this case reach that point.

## IV.     CONCLUSION

Simply stated, when viewed in the light most favorable to Plaintiff, Mr. Signorile's deposition testimony creates a factual dispute, one that Defendants have not persuasively shown to be immaterial and not requiring trial. Accordingly, Defendants' motion for summary judgment is DENIED.[5]

IT IS SO ORDERED.

Dated:     **August 6, 2013**                    /s/ Lawrence J. O'Neill
                                                                  UNITED STATES DISTRICT JUDGE

---

[5] If at any point the parties believe that another settlement conference may be beneficial, they should immediately contact the chambers of the assigned Magistrate Judge.